# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

*In re* **B.S.**

**No. 25-419** (Harrison County CC-17-2024-JA-195)

## MEMORANDUM DECISION

Petitioner Mother A.D.[1] appeals the Circuit Court of Harrison County's May 27, 2025, order terminating her parental, custodial, and guardianship rights to B.S., arguing that the court erred in denying her an improvement period, failing to grant her an alternative disposition, and denying her post-termination visitation with the child.[2] Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

The DHS filed a petition in November 2024, alleging that the petitioner had subjected the child to deplorable home conditions and that the child lacked proper hygiene. Specifically, Child Protective Service ("CPS") workers observed that the home lacked running water, was cluttered, was very cold, and that the bathroom ceiling was beginning to cave in. The workers also observed that the home had very little food. Referrals indicated that the child appeared dirty with matted hair and stated she did not have water at her house, had not bathed in days, and had to go to the bathroom outside. The petitioner also admitted to marijuana use.

After several continuances, the circuit court held an adjudicatory hearing in April 2025. The petitioner submitted a written stipulation admitting that she had abused and/or neglected B.S. due to the home's unsafe and unsanitary condition. The court accepted the petitioner's stipulation, and, on this basis, adjudicated her as a neglecting parent and B.S. as a neglected child.

The petitioner subsequently moved for a post-adjudicatory improvement period. The circuit court took up this motion together with disposition at a hearing in May 2025. At the outset, the court admitted into evidence, without objection, the petitioner's drug screening report, a report from the psychologist who conducted the petitioner's parental fitness evaluation, and a report from the supervised visitation provider. The visitation provider then testified that, during visits, the petitioner repeatedly engaged in inappropriate conversations with B.S. and did not provide the child with food, drink, or activities. The petitioner claimed she lacked the money to do so but once

---

[1] The petitioner appears by counsel Clarissa M. Banks. The Department of Human Services ("DHS") appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Carl E. Hostler. Counsel Rich McGervey appears as the child's guardian ad litem.

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

brought a drink for herself and, on another occasion, showed off a new tattoo. During one visit, the petitioner and B.S. were roughhousing when the petitioner appeared to become frustrated and pushed the child, who hit a doorframe and fell to the floor. The petitioner then failed to provide the child with appropriate comfort. The visitation provider testified that in a recent multidisciplinary team ("MDT") meeting, the petitioner "had excuses for all of it" and did not display insight into her behavior. The visitation provider witnessed no improvement in the petitioner's conduct and did not believe continued visits were in B.S.'s best interest. The individualized parenting provider testified that she began working with the petitioner in January 2025. She testified that the petitioner downplayed the visitation issues and did not understand the concern regarding her behavior. Although the parenting provider assisted the petitioner with budgeting, the petitioner later blamed her difficulty in paying rent on her participation in services.

The assigned CPS worker then testified to the various services that the petitioner received. The worker had addressed the petitioner's need for individual therapy on several occasions (starting in December 2024), but the petitioner declined the resources offered until shortly before disposition. The worker had not seen the petitioner's new apartment because the petitioner was not home for unannounced visits and did not respond to the worker's request to schedule a visit. The petitioner's landlord reported to the worker that the petitioner was at risk of eviction due to nonpayment of rent. The worker testified that she did not believe the petitioner was making any progress and that there were no other services the DHS could provide to aid the petitioner in correcting the conditions of neglect. The worker also testified to B.S.'s various mental health diagnoses as well as the child's behavioral issues in her placement, all of which "required a lot of intervention and a lot of services" and which worsened following visits with the petitioner. The worker stated that after ceasing supervised visitation, due to the petitioner's "inability to appropriately parent . . . or appropriately interact with [the child]," the child's behavior improved. The worker concluded that termination was in the child's best interest.

Finally, the petitioner testified that she was employed and that her apartment was suitable for the child. She explained that she planned to "get caught up" on the current month's rent with her next paycheck. Regarding her failure to provide for the child during supervised visits, the petitioner stated that "it must[] [have] slipped [her] mind." The petitioner testified to her "wonderful," close relationship with B.S., and acknowledged the child's behavioral issues and need for structure. In support of her motion for an improvement period, the petitioner claimed that she had done everything that was asked of her and would continue to follow the MDT's recommendations and fully participate in all services.

From the bench, the circuit court stated that although it did not doubt that the petitioner and the child loved one another, an improvement period would not benefit either. The court further noted that it would be detrimental to the child—who was "very highly special needs"—to continue visitation, observing that the petitioner did not appear to understand the gravity of her problems or their effect on the child. In a subsequent written order, the court found that the child "had exhibited some extreme behaviors" throughout the proceedings, "which were enhanced by visitation[] with the [petitioner]." It further found that the petitioner tested positive for THC between November 2024 and January 2025 and for amphetamine and methamphetamine once in February 2025. Per the psychological evaluation, the petitioner had "limited insight and judgment" and lacked "the parental capacity to care, protect and change in order to provide adequately for [B.S.] at this time."

2

The court also noted the petitioner's failure to "take responsibility for . . . inappropriate actions that occur[red] during [visits]," as well as her late rent payments, finding that she "continue[d] to have parenting deficiencies which she . . . failed to acknowledge, and instead, minimized and made excuses for." Ultimately the court found that, despite DHS intervention for "multiple months," the petitioner had "declined while in . . . services" and "failed to make any progress to show that she [was] likely to be able to correct the conditions of neglect that led to the filing of [the] petition in a reasonable time frame." The court therefore concluded that the petitioner had demonstrated an inadequate capacity to solve the problems of neglect on her own or with help. The court further concluded that given B.S.'s age, special needs, and behavioral issues, the child needed continuity of care and caretakers, as well as permanency. Accordingly, the court denied the petitioner's motion for a post-adjudicatory improvement period and terminated her parental, custodial, and guardianship rights, finding that there was no reasonable likelihood that the conditions of neglect could be substantially corrected in the near future and that termination was in B.S.'s best interest. The court also denied post-termination visitation, finding it would not be in the child's best interest. The petitioner now appeals from this dispositional order.[3]

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's findings of fact for clear error and its conclusions of law de novo. Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011). Further, "[w]e review a circuit court's decision to grant or deny a post-adjudicatory improvement period under an abuse of discretion standard." Syl. Pt. 1, *In re K.A.*, 251 W. Va. 626, 915 S.E.2d 520 (2025). The petitioner first asserts that the circuit court erred in failing to grant her a post-adjudicatory improvement period. West Virginia Code § 49-4-610(2)(B) permits a circuit court to grant an improvement period when a parent "demonstrates, by clear and convincing evidence, that [she] is likely to fully participate." However, a circuit court has discretion to deny an improvement period when no improvement is likely. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). Here, based upon the testimony of several witnesses, the court concluded that the petitioner would not benefit from an improvement period because, instead of making progress during the months she received services, the petitioner regressed. As such, we find that the court did not abuse its discretion in denying the petitioner an improvement period.

Next, the petitioner asserts that the circuit court erred in terminating her rights instead of imposing a less restrictive dispositional alternative. We disagree. We have repeatedly held that "[t]ermination of parental rights . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood . . . that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011) (quoting Syl. Pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980)). There is sufficient evidence to support the court's finding that there was no reasonable likelihood that the petitioner could substantially correct the conditions of neglect in this case. *See* W. Va. Code § 49-4-604(d) ("'No reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that . . . the abusing adult . . . ha[s] demonstrated an inadequate capacity to solve the problems of abuse or neglect on [her] own or with help."). The petitioner had several positive drug screens throughout the proceedings and did not respond to the DHS's rehabilitative efforts to

---

[3] The father's rights were also terminated. The permanency plan for the child is adoption.

improve her parenting deficiencies, which worsened despite the petitioner's receipt of services. For example, the evidence at disposition indicated that the petitioner was at risk of losing her residence due to rent nonpayment after receiving assistance with budgeting. Further, the court found that the petitioner minimized rather than acknowledged her conduct and its effect on the child. It was therefore not clearly erroneous for the court to conclude that there was no reasonable likelihood the conditions of neglect could be substantially corrected in the near future, especially considering the petitioner's refusal to take responsibility for her inappropriate conduct during visits. *See id.* § 604(d)(3); *see also In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) ("Failure to acknowledge the existence of the problem . . . results in making the problem untreatable."). The court additionally found, given B.S.'s diagnoses and unique needs, that termination was necessary for the child's welfare. Circuit courts are permitted to terminate a parent's rights upon these findings. *See* W. Va. Code § 49-4-604(c)(6) (permitting the termination of parental, custodial, and guardianship rights upon findings that "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is "necessary for the welfare of the child"). Accordingly, we find no error in the court's refusal to impose a less restrictive disposition than termination.

Lastly, the petitioner asserts that the circuit court erred in denying B.S. post-termination visitation, given their emotional bond.[4] We disagree, as "[a] court may grant post-termination visitation only if it finds that such visitation is in the child's best interests[.]" W. Va. R. P. Child Abuse & Neglect Proc. 15(b)(2)(A); *see also* Syl. Pt. 5, in part, *In re Christina L.*, 194 W. Va. 446, 460 S.E.2d 692 (1995) (noting that the evidence before the court "must indicate that [post-termination] visitation or continued contact would not be detrimental to the child's well being"). Here, the court acknowledged the loving bond between B.S. and the petitioner but also found that continued contact would be detrimental and not in the child's best interests. Ample evidence supports this finding, as both the supervised visitation provider and the assigned CPS worker testified to the petitioner's inappropriate conduct during supervised visits. The provider stated that continuing visitation was not in B.S.'s best interest—noting the petitioner's lack of insight into her conduct—and the worker observed that the child's concerning behaviors improved after visitation with the petitioner ceased. Accordingly, we conclude that the court did not err in denying the petitioner post-termination visitation.

For the foregoing reasons, we find no error in the decision of the circuit court to terminate the petitioner's rights, and its May 27, 2025, order is hereby affirmed.

Affirmed.

**ISSUED:** May 6, 2026

---

[4] On May 9, 2025, a few weeks prior to the dispositional hearing and the entry of the circuit court's order denying post-termination visitation, this Court provisionally amended Rule 15(b) of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings to more clearly articulate and adopt appropriate standards for consideration of post-termination visitation.

**CONCURRED IN BY:**

Chief Justice C. Haley Bunn
Justice William R. Wooton
Justice Charles S. Trump IV
Justice Thomas H. Ewing
Justice Gerald M. Titus III